**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Eugenia Bagdassarian, Esq. (Bar No. 334898)
ebagdassarian@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.H., a minor, individually and as successor in interest to decedent, Richard Hayes, by and through his Guardian ad Litem, Timothy Janson; S.H., a minor, individually and as successor in interest to decedent, Richard Hayes, by and through her Guardian ad Litem, Timothy Janson; and TIFFANY HAYES, individually and as successor in interest to decedent, Richard Hayes;<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; SHERIFF ALEX VILLANUEVA; CARLOS DE LA TORRE; ALEX VALDIVIA; JANET HOUTH; and DOES 5-10, inclusive.<br><br>Defendants. | Case No. 2:22-cv-03671-SB (ASx)<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES**<br><br>1. Fourth Amendment—Excessive Force (42 U.S.C. § 1983)<br>2. Fourth Amendment—Denial of Medical Care (42 U.S.C. § 1983)<br>3. Substantive Due Process (42 U.S.C. § 1983)<br>4. Municipal Liability—Inadequate Training (42 U.S.C. § 1983)<br>5. Municipal Liability—Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983)<br>6. Municipal Liability—Ratification (42 U.S.C. § 1983)<br>7. Battery<br>8. Negligence, Negligent Infliction of Emotional Distress<br>9. Violation of Cal. Civil Code § 52.1<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR DAMAGES

COME NOW, Plaintiffs A.H., individually and as a successor-in-interest to Richard Hayes, deceased; S.H., individually and as successor-in-interest to Richard

Hayes, deceased; and Tiffany Hayes, individually and as successor-in-interest to Richard Hayes, deceased, for their Complaint against Defendants County of Los Angeles; and DOES 1-10, inclusive, and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.  This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

3.      On November 22, 2021, Plaintiffs presented to the County of Los Angeles their Claims for Damages based on the acts, omissions, damages, and injuries herein complained of, pursuant to Government Code § 911.2.  On December 6, 2022, Defendant County of Los Angeles rejected Plaintiffs' claims. On April 22, 2022, the parties agreed by stipulation that Plaintiffs' claims for damages will be treated as timely and Defendant County will not challenge the timeliness of petitioners' claims for damages throughout all future proceedings in this case.

4.      On May 27, 2022, Plaintiffs filed their Complaint.

5.      On June 3, 2022, Plaintiffs filed their First Amended Complaint.

6.      On August 22, 2022, Plaintiffs filed their Second Amended Complaint.

7.      On October 7, 2022, the Court granted Plaintiffs leave to file a Third Amended Complaint.

**INTRODUCTION**

8.     This civil rights and state tort action seeks compensatory and punitive damages from Defendants for violating various rights under the United States Constitution and state law in connection with County of Los Angeles Sheriff's deputy-involved death of Richard Hayes on March 21, 2021.

**PARTIES**

9.     At all relevant times, Decedent Richard Hayes ("DECEDENT") was an individual residing in the County of Los Angeles, California.

10.     Plaintiff A.H. is a minor individual residing in County of Los Angeles, California, and is the natural born son to DECEDENT.  A.H. sues by and through his Guardian *ad Litem*, TIMOTHY JANSON.  A.H. sues both in his individual capacity as the son of DECEDENT and in a representative capacity as a successor-in-interest to DECEDENT pursuant to California Code of Civil Procedure § 377.30.  A.H. seeks survival damages, including pre-death mental and physical pain and suffering, loss of life, and loss of enjoyment of life, and wrongful death damages under federal and state law.

11.     Plaintiff S.H. is a minor individual residing in County of Los Angeles, California, and is the natural born daughter to DECEDENT.  S.H. sues by and through her Guardian *ad Litem*, TIMOTHY JANSON.  S.H. sues both in her individual capacity as the daughter of DECEDENT and in a representative capacity as a successor-in-interest to DECEDENT pursuant to California Code of Civil Procedure § 377.30.  S.H. seeks survival damages, including pre-death mental and physical pain and suffering, loss of life, and loss of enjoyment of life, and wrongful death damages under federal and state law.

12.     Plaintiff TIFFANY HAYES is an individual residing in County of Los Angeles, California, and is the wife of DECEDENT.  TIFFANY HAYES sues in her individual capacity and in a representative capacity as a successor-in-interest to

DECEDENT as the wife of DECEDENT pursuant to California Code of Civil Procedure § 377.30.  TIFFANY HAYES seeks survival damages, including pre-death mental and physical pain and suffering, loss of life, and loss of enjoyment of life, and wrongful death damages under federal and state law.

13.     Plaintiff A.H. is DECEDENT's successor-in-interest as defined in Section 377.11 of the California Code of Civil Procedure and succeeds to DECEDENT'S interest in this action as the natural son of DECEDENT.

14.     Plaintiff S.H. is DECEDENT's successor-in-interest as defined in Section 377.11 of the California Code of Civil Procedure and succeeds to DECEDENT'S interest in this action as the natural daughter of DECEDENT.

15.     Plaintiff TIFFANY HAYES is DECEDENT's successor-in-interest as defined in Section 377.11 of the California Code of Civil Procedure and succeeds to DECEDENT'S interest in this action as the wife of DECEDENT.

16.     At all relevant times, Defendant COUNTY OF LOS ANGELES ("COUNTY") is and was a duly organized public entity existing under the laws of the State of California.  COUNTY is a chartered subdivision of the State of California with the capacity to be sued.  COUNTY is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the County of Los Angeles Sheriff's Department and its agents and employees.

17.     At all relevant times, COUNTY was the employer of Defendants ALEX VILLANUEVA, CARLOS DE LA TORRE, ALEX VALDIVIA, JANET HUOTH, and DOES 5-10, inclusive.

18.     Defendant SHERIFF ALEX VILLANUEVA ("VILLANUEVA") is the Sheriff for the County of Los Angeles Sheriff's Department. VILLANUEVA was acting under color of law and within the course and scope of his duties as the Sheriff

1  for the County of Los Angeles. VILLANUEVA was acting with the complete

2  authority and ratification of his principal, Defendant COUNTY.

3      19.    Defendant CARLOS DE LA TORRE ("DE LA TORRE") is a Sheriff's

4  deputy for the County of Los Angeles Sheriff's Department. DE LA TORRE was

5  acting under color of law and within the course and scope of his duties as a deputy

6  for the County of Los Angeles Sheriff's Department. DE LA TORRE was acting with

7  the complete authority and ratification of his principal, Defendant COUNTY.

8      20.    Defendant ALEX VALDIVIA ("VALDIVIA") is a Sheriff's deputy for

9  the County of Los Angeles Sheriff's Department. VALDIVIA was acting under color

10  of law and within the course and scope of his duties as a deputy for the County of Los

11  Angeles Sheriff's Department. VALDIVIA was acting with the complete authority

12  and ratification of his principal, Defendant COUNTY.

13      21.    Defendant JANET HUOTH ("HUOTH") is a Sheriff's deputy for the

14  County of Los Angeles Sheriff's Department. HUOTH was acting under color of law

15  and within the course and scope of his duties as a deputy for the County of Los

16  Angeles Sheriff's Department. HUOTH was acting with the complete authority and

17  ratification of her principal, Defendant COUNTY.

18      22.    Defendant DOES 5-6 ("DOE DEPUTIES") are Sheriff's deputies for the

19  County of Los Angeles Sheriff's Department.  DOE DEPUTIES were acting under

20  color of law within the course and scope of their duties as deputies for the County of

21  Los Angeles Sheriff's Department.  DOE DEPUTIES were acting with the complete

22  authority and ratification of their principal, Defendant COUNTY.

23      23.    Defendant DOES 7-8 are supervisory deputies for the County of Los

24  Angeles Sheriff's Department who were acting under color of law within the course

25  and scope of their duties as supervisory deputies for the County of Los Angeles

26  Sheriff's Department.  DOES 7-8 were acting with the complete authority and

27  ratification of their principal, Defendant COUNTY.

28

24.     Defendants DOES 9-10 are managerial, supervisorial, and policymaking employees of the County of Los Angeles Sheriff's Department, who were acting under color of law within the course and scope of their duties as managerial, supervisorial, and policymaking employees for the County of Los Angeles Sheriff's Department.  DOES 9-10 were acting with the complete authority and ratification of their principal, Defendant COUNTY.

25.     On information and belief, at all relevant times, VILLANUEVA, DE LA TORRE, VALDIVIA, HOUTH, and DOES 5-10 were residents of the County of Los Angeles.

26.     In doing the acts, and failing and/or omitting to act as hereinafter described, Defendants VILLANUEVA, DE LA TORRE, VALDIVIA, HOUTH, and DOES 5-6 were acting on the implied and actual permission and consent of Defendants COUNTY, VILLANUEVA, and DOES 7-10.

27.     In doing the acts, and failing and/or omitting to act as hereinafter described, Defendants VILLANUEVA, DE LA TORRE, VALDIVIA, HOUTH, and DOES 5-10 were acting on the implied and actual permission and consent of the COUNTY.

28.     The true names and capacities, whether individual, corporate, association or otherwise of Defendant DOES 5-10, inclusive, are unknown to Plaintiffs, who otherwise sue these Defendants by such fictitious names.  Plaintiffs will seek leave to amend this complaint to show the true names and capacity of these Defendants when they have been ascertained.  Each of the fictitiously-named Defendants is responsible in some manner for the conduct or liabilities alleged herein.

29.     At all times mentioned herein, each and every Defendant was the agent of each and every other Defendant and had the legal duty to oversee and supervise the hiring, conduct, and/or employment of each and every Defendant.

30.    All of the acts and omissions complained of herein by Plaintiffs against Defendants, were done and performed by said Defendants, by and through their authorized agents, servants, and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity.  Moreover, Defendants and their agents ratified all of the acts complained of herein.

31.    VILLANUEVA, DE LA TORRE, VALDIVIA, HOUTH and DOES 5-10 are sued in their individual capacities.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

32.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 31 of this Complaint with the same force and effect as if fully set forth herein.

### The Incident

33.    On March 21, 2021, at approximately 7:30 p.m., at or around Lycoming Street in Diamond Bar, California, several County of Los Angeles Sheriff's Department ("LASD") deputies, including DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES used excessive and unreasonable force and restraint against DECEDENT Richard Hayes, causing him pain and suffering and ultimately resulting in his death. DECEDENT was 44 years old.

34.    On March 20, 2021, DECEDENT came home after work and recognized that he was not feeling well. DECEDENT contacted numerous in-patient mental health clinics but was turned away due to the clinics' space limitations. At the time, in-patient clinics' capacities were reduced and demand heightened due to the COVID-19 pandemic.

35.    On March 21, 2021, DECEDENT did not go to work because he was not feeling well. When Plaintiffs arrived at home in the late afternoon, DECEDENT had

packed his belongings in the hopes of finding an in-patient clinic that would admit him. Soon thereafter, DECEDENT began talking to himself and hearing voices. DECEDENT called his mother and grandfather and informed them that he wanted to go to the hospital.

36.    TIFFANY HAYES, DECEDENT's wife, again contacted numerous mental health clinics to determine whether they had the capacity to admit DECEDENT. After her attempts were unsuccessful, TIFFANY HAYES suggested that they call law enforcement to transport DECEDENT to a hospital. DECEDENT agreed to this course of action.

37.    TIFFANY HAYES called 9-1-1 and informed dispatch that DECEDENT was having a mental health crisis and needed to be transported to the hospital.

38.    Defendants DE LA TORRE and VALDIVIA were the first two deputies to arrive on scene. Defendants DE LA TORRE, VALDIVIA, and the 9-1-1 dispatcher were advised that DECEDENT was experiencing a mental health crisis. Nevertheless, DE LA TORRE and VALDIVIA were dispatched to DECEDENT'S home without a mental health expert from the department's Mental Evaluation Team.

39.    Defendant DE LA TORRE and VALDIVIA were also advised that DECEDENT was unarmed.

40.    Upon DE LA TORRE and VALDIVIA's arrival, DECEDENT was calm and compliant. However, at some point, DECEDENT indicated that he wanted DE LA TORRE and VALDIVIA to leave his home. DECEDENT began approaching DE LA TORRE and VALDIVIA, at which point TIFFANY HAYES held onto DECEDENT.

41.    Defendants DE LA TORRE and VALDIVIA failed to employ tactics to de-escalate the situation, failed to give DECEDENT time and space to understand the

deputies' presence, and failed to approach and speak to DECEDENT in a non-threatening manner.

42.     Instead, DE LA TORRE and VALDIVIA screamed at TIFFANY HAYES to let go of DECEDENT, and VALDIVIA Tased DECEDENT without warning. The Taser prongs attached to DECEDENT's chest/torso area. DECEDENT became incapacitated causing him to fall on top of TIFFANY HAYES.

43.     Immediately before and at the time of the initial Tasing, DECEDENT was not assaultive, was visibly unarmed, and was experiencing a mental health crisis. Nevertheless, DE LA TORRE and VALDIVIA failed to deescalate the situation and instead escalated the situation by tasing DECEDENT.

44.     After being Tased and falling to the ground, DECEDENT stood up and ran away from DE LA TORRE and VALDIVIA into his backyard.

45.     DE LA TORRE and VALDIVIA ran after DECEDENT, caught up to DECEDENT, and Tased DECEDENT again in the backyard. Immediately preceding and at the time of the second Taser deployment, DECEDENT was not assaultive, was visibly unarmed, and was experiencing a mental health crisis. At that point, DECEDENT did not pose a serious threat, and certainly not an imminent threat of death or serious bodily injury, to anyone. DECEDENT was simply attempting to get away from DE LA TORRE and VALDIVIA who had just Tased him inside his own home.

46.     Tasers are designed to discharge for five seconds when the trigger is pulled. After a five-second application, an officer must pull the trigger again to reactivate the electric current or hold down the trigger to continue the electrical charge past the initial five-second activation cycle.

47.     VALDIVIA Tased DECEDENT for a total of 35 seconds – one deployment for 18 continuous seconds and another for 17 continuous seconds – well beyond its normal five-second cycle.

48.     After VALIDIVIA Tased DECEDENT again in the backyard, DECEDENT fell to the ground and was in a prone position on his stomach. DE LA TORRE and VALDIVIA immediately piled on top of DECEDENT, placing their body weight on DECEDENT's back. Shortly thereafter, DECEDENT was handcuffed. DE LA TORE and VALDIVIA continued to place their body weight on DECEDENT after he was handcuffed.

49.     Subsequently, HOUTH arrived and placed her knee on the back of DECEDENT's neck and head while the DE LA TORRE and VALDIVIA continued applying bodyweight and pressure to DECEDENT's back, thereby impeding DECEDENT's ability to breathe.

50.     Defendant HOUTH also knew that DECEDENT was experiencing a mental health crisis.

51.     While DE LA TORRE, VALDIVIA, and HOUTH applied pressure to DECEDENT's back, DECEDENT began grunting and visibly struggling to breathe. Nevertheless, for approximately five minutes, DE LA TORRE, VALDIVIA, and HOUTH failed to monitor DECEDENT's vital signs and breathing and continued applying their body weight to DECEDENT's back, neck, and head. DE LA TORRE, VALDIVIA, and HOUTH continued the restraint even after DECEDENT stopped resisting and eventually lost consciousness.

52.     After DECEDENT stopped moving and eventually lost consciousness, Defendants DE LA TORRE, VALDIVIA, and HOUTH failed to timely provide medical assistance to DECEDENT or summon medical attention. The delay of medical care to DECEDENT was a contributing cause of DECEDENT'S harm, injury, pain and suffering, and ultimate death.

53.     After being Tased for 35 seconds while in the midst of a mental health crisis and continuously restrained with pressure to his back and neck for approximately five minutes, DECEDENT became unresponsive and died on scene.

54.     The manner of the prone restraint on DECEDENT amounted to deadly force.

55.     The use of force against DECEDENT was excessive and objectively unreasonable since DEFENDANTS DE LA TORRE, VALDIVIA, and HOUTH knew DECEDENT was experiencing a mental health crisis, unarmed, in need of medical assistance, and did not pose an immediate threat to anyone immediately prior to or during the various uses of force.

56.     Defendants DE LA TORRE, VALDIVIA, and HOUTH meaningfully participated in the detention of, and use of force against DECEDENT, by either directly using force against DECEDENT, going hands-on with DECEDENT during the incident, ordering another Defendant to use excessive and unreasonable force against DECEDENT, providing the means by which force was used against DECEDENT, physically restraining DECEDENT, violently intimidating DECEDENT, and/or failing to provide medical aid to DECEDENT.  Defendants DE LA TORRE, VALDIVIA, and HOUTH also integrally participated in the use of force and violence as described herein, as well as failed to instruct any other Defendant not to use force against the DECEDENT, failed to provide medical aid to DECEDENT, and failed to intervene to stop the unreasonable and excessive force being used against DECEDENT.

<u>Tasers – Risks, Training, and Policies</u>

57.     It is generally known in the law enforcement community that the use of Tasers and physical struggle increase the demand for oxygen and the risk of positional asphyxiation from prone restraint.

58.     In 2006 and 2011, the United States Department of Justice ("DOJ"), International Association of Chiefs of Police, Office of Community Oriented Policing Services, Bureau of Justice Assistance, National Institute of Justice, and other policing organizations and associations developed and published guidelines regarding

the use of the Taser. The guidelines included directives limiting Taser usage to no more than three cycles (15 seconds) and avoiding firing Taser darts into the chest.

59.     When the DOJ updated its publication in 2011, it included more detailed warnings regarding repeated or multiple applications and Taser usage against high-risk populations. Specifically, the DOJ indicated that repeated or multiple applications may increase the risk of death. The DOJ noted that the most common factors that appear to be associated with fatal and other serious outcomes include: (1) repeated and multiple applications, (2) cycling time that exceeds 15 seconds in duration, and (3) simultaneous applications by more than one ECW. The DOJ proceeded to implore police departments to train their officers that "repeated application and continuous cycling of ECWs may increase the risk of death or serious injury and should be avoided."

60.     In the same 2011 publication, the DOJ advised against using Tasers on "persons in medical/mental crisis."

61.     In 2009, TASER International, the manufacturer of Tasers, published Training Bulletin 15.0, which acknowledged and endorsed the DOJ's published guidelines, including the 15-second limit and the directive to avoid firing darts into a subject's chest.

62.     Since 2009, TASER International Training/Certification lesson plans and product warnings continue to include the 15-second limit and the warnings of increased risks to the heart when taser darts are fired into the chest.

63.     In 2013, TASER International issued revised training materials advising officer to avoid shocking someone "who is actually or perceived to be mentally ill." TASER International also advised officers to "reassess the subject's resistance level before initiating or continuing the exposure."

64.     In 2010, the American Academy of Emergency Medicine issued a Clinical Practice Statement advising physicians that to consider additional evaluation

and treatment for individuals who experienced an Electric Control Weapon ("ECW") application for more than 15 seconds.

65.     It is generally known in scientific and law enforcement communities that repeatedly Tasing a suspect who is experiencing a mental health crisis puts them at risk for sudden death. In addition, Tasers increase the risk of serious injury or death when an individual is experiencing symptoms of excited delirium or in the middle of a mental health crisis. Peace officers further exacerbate that risk when they put individuals in a prone position and apply bodyweight to the individual's body to keep them prone.

66.     It is generally accepted that subjects who appear to be in an agitated or excited state, usually due to mental illness, and are acting delirious or irrational, have a significantly elevated need for oxygen and are therefore more susceptible to positional asphyxiation. Compounding the risk is that people who are in such a state of "excited" or "agitated" delirium, while frequently not involved in any criminal activity, nevertheless are not responsive to officer presence and verbal commands that are normally effective in gaining compliance without the use of force.

67.     Reasonably trained officers are instructed on the risks associated with excessive Taser usage, including cardiac complications and death. In addition, reasonably trained officers would not deploy a taser for a total of 35 seconds due to the health risks such exposure could cause.

68.     Reasonably trained officers are aware that they should place a subject in a recovery position following a Taser application.

69.     Plaintiffs are therefore informed, believe, and allege that Defendant COUNTY has failed to properly train, supervise, and/or discipline its employees with regards to the use and effects of electric shock devices such as Tasers, especially as it pertains to the use of Tasers against individuals who are experiencing a mental health

crisis, otherwise predisposed to health complications from prolonged and sustained exposure to a Taser, or subjected to prone restraint.

70.     COUNTY and VILLANUEVA knew, or reasonably should have known, that their failure to properly train, supervise, and/or discipline their deputies regarding the use of Tasers could plausibly lead to their improper use and the subsequent death of individuals interacting with LASD deputies.

71.     COUNTY and VILLANUEVA nevertheless failed to promulgate and/or enforce policies to prevent the unnecessary and excessive use of Tasers. The following is a short, non-exhaustive list of critical directives that LASD's published policy omits: (1) a meaningful discussion regarding when it is appropriate to deploy a Taser, including the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before a Taser is deployed; (2) any mention of a limit on the amount of time a deputy may use a Taser on a person; (3) the inappropriateness of using a Taser on an individual who is clearly experiencing a mental health crisis; (4) the inappropriateness of using a Taser on an individual who is at "high-risk" for complications for any other reason, such as obesity; (5) the risks associated with multiple and continuous Taser deployments on a person.

72.     COUNTY's and VILLANUEVA's failure to promulgate proper policies and adequately train LASD deputies on the risks associated with the use of a Taser indicate that COUNTY and VILLANUEVA acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of DECEDENT, Plaintiffs, and others similarly situated.

<u>Prone Restraint – Risks, Training, and Policies</u>

73.     Moreover, the law enforcement community has known about the risks of positional and restraint asphyxia for over thirty years.

74.     It is well known and generally accepted that keeping individuals in the prone position can negatively affect the subject's breathing and cause or contribute to positional asphyxia.

75.     It is also generally accepted that the risks of asphyxiation are magnified when officers apply weight or pressure to a handcuffed, prone subject, especially when the subject has been Tased for an extended period of time.

76.     In 1995, the United States Department of Justice published a bulletin stating, "[A]s soon as the suspect is handcuffed, get him off his stomach." The failure to do so could create a "vicious cycle of suspect resistance and officer restraint" in which the handcuffed, prone subject's breathing becomes labored as they begin to experience an oxygen deficit, the subject responds to the oxygen deficiency by struggling to reposition themselves to breathe, and the officers respond to the subject's struggling by putting more weight on their back, which further compromises the subject's breathing.

77.     In 1998, the International Association of Chiefs of Police wrote, "during the past decade, police departments have been repeatedly warned not to permit the restraint of prisoners in the prone position."

78.     In 2017, the International Association of Chiefs of Police developed a model policy which stated "[w]hen restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck or head. Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object using their body weight. Officers should check the subject's pulse and respiration on a continuous basis until transferred to emergency medical services personnel."

79.     California Peace Officers Standard and Training, the state organization that sets minimum standards for police training in the State of California, identifies

that positional asphyxia, or body positioning that restricts breathing, could lead to inadequate breathing and potential respiratory arrest.

80.     Today, many police agencies have policies explicitly restricting the use of prone restraint and directing officers to avoid keeping handcuffed individuals in the prone position for any extended period of time.

81.     Reasonably trained officers know that breathing requires increasing the size of the chest by expanding the ribs and contracting the diaphragm, allowing air to fill the lungs. When a person is prone, performing both of these functions can be more difficult. The contents of the abdomen press against the diaphragm. In order to raise the ribs or use the diaphragm while in a prone position, the weight of the body must be lifted. An officer kneeling or lying on the individual's back aggravates the situation because the additional weight of the officer(s) must be lifted along with the weight of the person's body. The greater the weight or more intense the compression, the harder it becomes to breathe. As a result, the suspect struggles to breathe, and the untrained officer responds by using more force.

82.     Reasonably trained officers are instructed on how improper restraint techniques can bock the flow of air into an individual's lungs, contributing to Positional, or Restraint, Asphyxia. Key risk factors that exacerbate the likelihood of a deadly outcome include: (1) obesity; (2) pre-existing medical conditions; (3) the length of any struggle; and (4) whether the individual suffers from a mental condition. Experts have opined that excessive restraint in conjunction with one or more of these risk factors has the potential to wreak havoc on the cardiovascular and respiratory systems.

83.     DECEDENT was obese, had been Tased for a total of 35 seconds, and was experiencing a severe mental health crisis. DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES did, or should have, recognized that these factors heightened the risk of DECEDENT sustaining severe injury or death from extended

periods of prone restraint, especially with three deputies applying body weight to DECEDENT's back, head, and neck.

84.     DE LA TORRE's, VALDIVIA's, HOUTH's, and DOE DEPUTIES' actions of Tasing DECEDENT multiple times and for a total of 35 seconds; placing DECEDENT in a prone position; applying body weight and pressure to DECEDENT's back, neck, and legs; ignoring indications that DECEDENT was struggling to breathe; neglecting to monitor DECEDENT's vital signs; and failing to move DECEDENT into a recovery position is reflective of recklessly improper and inadequate training.

85.     The written policies of COUNTY and the LASD are, and were at the time of the incident, deficient and foreseeably led to the use of excessive force by its deputies. This includes LASD's failure to implement written policies and training regarding the known potential risks of keeping a person handcuffed, in a prone position, and applying weight to a subject's back. Despite LASD's knowledge of the dangers associated with prone restraint, especially when coupled with extensive Taser deployments, DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES were not trained regarding the mechanism and dangers of restraint asphyxia. Reasonable officers are provided with proper training and are subject to proper policies regarding the known potential risks of restraint and positional asphyxia, particularly for individuals in the prone position with weight applied to their backs.

86.     LASD's policies do not include any prohibition on placing weight on a restrained subject's neck, torso, or back.

87.     As previously indicated, LASD's policies are also deficient with regards to the proper use of Tasers.

88.     In addition, LASD's policies do not advise deputies of the risk factors that significantly increase the risk of death or serious bodily injury associated with

restraining a subject who is experiencing a mental health crisis, is obese, and has been Tased for an extended period of time.

89.     The complete lack of training and policies regarding positional and restraint asphyxia and Tasers have resulted in the death of numerous individuals in the custody of LASD deputies. The following are only a few examples of continued conduct by sheriff's deputies working for the County of Los Angeles that exemplify and depict inadequate training, unconstitutional policies, and ratification of unconstitutional excessive force by LASD and its deputies:

> (a)     On May 3, 2021, Los Angeles County agreed to pay $2 million to the family of Jeremy Spencer, a mentally ill man who died after Los Angeles County Sheriff's deputies tased and forcibly restrained him.

> (b)     On March 16, 2020, Los Angeles Sheriff's Department deputies responded to a call from the mother of a man experiencing a mental health crisis. Upon arrival, Deputies proceeded to tase, beat, and restrain Eric Briceno in front of his mother and father. Coroner's officials concluded that Briceno died as a result of neck compressions and seven or eight Taser shocks.

> (c)     On January 6, 2015, Brian Pickett's mother called LASD deputies because her son was having a mental health episode. Upon their arrival, deputies tased Mr. Pickett for 34 seconds, causing him to fall into his bathtub. Deputies then dragged him into the hallway of his own home where he was pronounced dead. In reviewing the incident, LASD's official Corrective Action Plan ("CAP") indicated that a root cause of the incident was the LASD deputy's use of the Taser against the Decedent for 34 seconds. The CAP also listed the manner in which Mr.

1    Pickett was restrained as a root cause of the incident. The

2    County of Los Angeles settled this case for $5 million.

3    (d)    On August 3, 2012, LASD deputies beat Darren Burley and

4    placed their knees on his back, neck, and head, applying as

5    much weight as possible. As Mr. Burley struggled to lift his

6    chest in an effort to breathe, deputies tased Mr. Burley and

7    applied more weight to his body. Mr. Burley lost consciousness

8    and died 10 days later. A jury found the defendants liable and

9    awarded $8 million in damages.

10   (e)    On March 10, 2021, LASD deputy Douglass Johnson knelt on

11   an inmate's neck for over three minutes while the inmate was

12   handcuffed and restrained by multiple deputies. VILLANUEVA

13   was aware that Deputy Johnson had knelt on the neck of the

14   inmate for over three minutes because he had been shown a

15   video of the incident. Nevertheless, VILLANUEVA attempted

16   to cover up the incident, telling his subordinates that LASD did

17   not need bad media. VILLANUEVA and LASD allowed

18   Deputy Johnson to remain on the force as a deputy for over

19   eight months before they relieved him of duty on November 18,

20   2021. Fifteen months prior, the same Deputy Johnson had taken

21   photographs of Kobe Bryant and Gianna Bryant's deceased

22   bodies and published them. Deputy Johnson was not retrained,

23   disciplined, suspended, or terminated during the time period

24   between the two incidents.

25   (f)    LASD employees were responsible for a larger number of

26   deaths than other county departments in California in recent

27   years.

28

90.     As a result of the excessive force, DECEDENT endured severe harm, injury, mental and physical pain and suffering, loss of life, loss of enjoyment of life, and loss of earning capacity.  At the time of the Defendants DE LA TORRE, VALDIVIA, and HOUTH's use of excessive force against him, DECEDENT did not pose an imminent risk of death or serious bodily injury to any person and was not resisting detention or arrest.  DECEDENT was experiencing a mental health crisis.

91.     DE LA TORRE, VALDIVIA, and HOUTH's use of excessive and unreasonable tasing, restraint, and force caused DECEDENT's death.

92.     COUNTY, VILLANUEVA, and DOES 7-10 knew or should have known of the history, propensity, custom and pattern, prior to and after the use of excessive force against DECEDENT, of DE LA TORRE, VALDIVIA, and HOUTH to use unreasonable police tactics that lead to the unnecessary use of excessive force and serious bodily injury or death.

## FIRST CLAIM FOR RELIEF

### Fourth Amendment —Excessive Force (42 U.S.C. § 1983)

(By All Plaintiffs against Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES)

93.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 92 of this Complaint with the same force and effect as if fully set forth herein.

94.     The Fourth Amendment to the United States Constitution, as applied to State Actors by the Fourteenth Amendment, provides the right of every person to be free from the use of excessive force by law enforcement.

95.     Defendant DE LA TORRE and VALDIVIA were advised that DECEDENT was experiencing a mental health crisis. Nevertheless, DE LA TORRE

and VALDIVIA were dispatched to DECEDENT'S home without a mental health expert from the department's Mental Evaluation Team.

96.     Defendant DE LA TORRE and VALDIVIA were advised that DECEDENT was unarmed.

97.     Upon DE LA TORRE and VALDIVIA's arrival, DECEDENT was calm and compliant. At some point, DECEDENT indicated that he wanted DE LA TORRE and VALDIVIA to leave his home. DECEDENT began approaching DE LA TORRE and VALDIVIA, at which point TIFFANY HAYES held onto DECEDENT and attempted to pull DECEDENT away.

98.     Defendants DE LA TORRE and VALDIVIA failed to employ tactics to de-escalate the situation, failed to give DECEDENT time and space to understand the deputies' presence, and failed to approach and speak to DECEDENT in a non-threatening manner.

99.     Instead, DE LA TORRE and VALDIVIA screamed at TIFFANY HAYES to let go of DECEDENT, and VALDIVIA Tased DECEDENT without warning. The Taser prongs attached to DECEDENT's chest/torso area. DECEDENT became incapacitated and fell on top of TIFFANY HAYES.

100.    Immediately before and at the time of the initial Tasing, DECEDENT was not assaultive, was visibly unarmed, and was experiencing a mental health crisis. Nevertheless, DE LA TORRE and VALDIVIA failed to deescalate the situation, failed to give DECEDENT time and space to understand DE LA TORRE's and VALDIVIA's presence, failed to approach and speak to DECEDENT in a non-threatening manner, failed to give DECEDENT time and space to understand and comply with DE LA TORRE's and VALDIVIA's commands, and failed to give DECEDENT the opportunity to consent to and cooperate with DE LA TORRE's and VALDIVIA's instructions.

101.   After being Tased and falling to the ground, DECEDENT stood up and ran away from DE LA TORRE and VALDIVIA into his backyard.

102.   DE LA TORRE and VALDIVIA ran after DECEDENT, caught up to DECEDENT, and Tased DECEDENT again in the backyard. Immediately preceding and at the time of the second Taser deployment, DECEDENT was not assaultive, was visibly unarmed, and was experiencing a mental health crisis. At that point, DECEDENT did not pose a serious threat, and certainly not an imminent threat of death or serious bodily injury, to anyone. DECEDENT was simply attempting to get away from DE LA TORRE and VALDIVIA who had just Tased him inside his own home.

103.   Tasers are designed to discharge for five seconds when the trigger is pulled. After a five-second application, an officer must pull the trigger again to reactivate the electric current or hold down the trigger to continue sending an electrical charge past the initial five-second activation cycle.

104.   VALDIVIA Tased DECEDENT for a total of 35 seconds – one deployment for 18 continuous seconds and another for 17 continuous seconds.

105.   After the second Tase, DECEDENT fell to the ground and was in a prone position on his stomach. DE LA TORRE and VALDIVIA immediately piled on top of DECEDENT, placing their body weight on DECEDENT's back. Shortly thereafter, DECEDENT was handcuffed. Subsequently, HOUTH arrived and placed her knee on the back of DECEDENT's neck while the DE LA TORRE and VALDIVIA continued applying bodyweight and pressure to DECEDENT's back, thereby impeding DECEDENT's ability to breathe.

106.   Defendant HOUTH also knew that DECEDENT was experiencing a mental health crisis.

107.   While DE LA TORRE, VALDIVIA, and HOUTH applied pressure to DECEDENT's back, DECEDENT began grunting and visibly struggling to breathe.

Nevertheless, for approximately five minutes, DE LA TORRE, VALDIVIA, and HOUTH failed to monitor DECEDENT's vital signs and breathing and continued applying their body weight to DECEDENT's back, neck, and head. DE LA TORRE, VALDIVIA, and HOUTH continued the restraint even after DECEDENT stopped resisting and eventually lost consciousness.

108.   After DECEDENT lost consciousness, Defendants DE LA TORRE, VALDIVIA, and HOUTH failed to timely provide medical assistance to DECEDENT or summon medical attention. The delay of medical care to DECEDENT was a contributing cause of DECEDENT'S harm, injury, pain and suffering, and ultimate death.

109.   After being tased for 35 seconds while in the midst of a mental health crisis and continuously restrained with pressure to his back and neck for approximately five minutes, DECEDENT eventually became unresponsive and died on scene.

110.   The use of force against DECEDENT was excessive and objectively unreasonable since DEFENDANTS DE LA TORRE, VALDIVIA, and HOUTH knew DECEDENT was mentally impaired, and DEFENDANTS knew DECEDENT was unarmed, was in need of medical assistance, and did not pose an immediate threat to anyone immediately prior to or during the various uses of force.

111.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES had no information that DECEDENT harmed any person or threatened to harm any person. However, Defendants had constructive and actual knowledge that Decedent was in need of medical and mental health care.

112.   Rather than acting reasonably by responding to the call in a manner conducive to assisting someone who is mentally ill or impaired, Defendants improperly treated DECEDENT as if he had committed a serious crime, which he had not.

113.   DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES knew or should have known that extended prone restraint could interfere with a subject's ability to breathe and cause death, particularly when the subject is obese, experiencing a mental health crisis, and has been Tased for an extended period of time.

114.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES used excessive force against DECEDENT when they unnecessarily and unreasonably brought DECEDENT to the ground with force and violence, tased DECEDENT multiple times without warning and for 35 seconds, and restrained DECEDENT chest down for an extended period of time with DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES placing their weight on DECEDENT's back. DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES continued restraining DECEDENT with weight on his back, neck, and head after he stopped resisting and also after he lost consciousness.

115.   Defendants' acts and omissions deprived DECEDENT of his right to be secure in his person against unreasonable searches and seizures as guaranteed to DECEDENT under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

116.   As a result of the foregoing, DECEDENT suffered great physical pain and suffering up to the time of his death, loss of enjoyment of his life, loss of his life, and loss of his earning capacity.  Defendants are liable for DECEDENT'S harm, injuries, and death because they were an integral participants and/or because they failed to intervene to prevent these violations.

117.   The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT, and therefore warrants the imposition of exemplary and punitive damages as to Defendants.

118.   Because Defendants used deadly force against an unarmed, chest down, restrained, and outnumbered individual, their conduct was particularly egregious. DECEDENT posed no immediate threat of death or serious bodily injury at the time during the incident.

119.   Plaintiffs bring this claim as successors-in-interest to the DECEDENT, and seek survival damages, including but not limited to pre-death pain and suffering, loss of life, and loss of enjoyment of life for the violation of DECEDENT'S rights. Plaintiffs also seek attorneys' fees and costs under this claim.

## <u>SECOND CLAIM FOR RELIEF</u>

**Fourth Amendment —Denial of Medical Care (42 U.S.C. § 1983)**

(By All Plaintiffs against Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES)

120.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 119 of this Complaint with the same force and effect as if fully set forth herein.

121.   The denial of medical care by Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES deprived DECEDENT of his right to be secure in his person against unreasonable searches and seizures as guaranteed to DECEDENT under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

122.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES failed to provide needed medical care to DECEDENT, failed to timely summon needed medical care for DECEDENT, prevented medical care personnel from timely treating DECEDENT, and refused to permit medical care personnel to access and care for DECEDENT at the scene for an appreciable amount of time after DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES Tased DECEDENT

multiple times for 35 seconds, wrestled him to the ground, and placed their body weight on DECEDENT for an extended period of time while DECEDENT was experiencing a mental health crisis. DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES continued restraining DECEDENT with weight on his back, neck, and head after he stopped resisting and also after he lost consciousness

123.   DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES knew or should have known that extended prone restraint could interfere with a subject's ability to breathe, particularly when the subject is obese, experiencing a mental health crisis, and has been Tased.

124.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES knew that failure to provide timely medical treatment to DECEDENT, especially after they had Tased him numerous times and piled on top of DECEDENT'S back, could result in further significant injury, the unnecessary and wanton infliction of pain, or death, but disregarded that serious medical need, causing DECEDENT great bodily harm and death. Even after DECEDENT'S breathing became labored and shallow, DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES failed to timely summon medical assistance. Based on their own Department's policies, Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES knew or should have known that said delay in medical care would result in further injury and, potentially, death.

125.   As a result of the foregoing, DECEDENT suffered great physical pain and suffering up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity.

126.   The conduct of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT and therefore warrants the imposition of

exemplary and punitive damages as to Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES.

127.   As a result of their misconduct, DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES are liable for DECEDENT'S injuries, either because they were integral participants in the denial of medical care, and/or because they failed to intervene to prevent these violations.

128.   Plaintiffs bring this claim as successors-in-interest to the DECEDENT, and seek survival damages, including but not limited to pre-death pain and suffering, loss of life, and loss of enjoyment of life for the violation of DECEDENT'S rights. Plaintiffs also seek attorneys' fees and costs under this claim.

### THIRD CLAIM FOR RELIEF

### Substantive Due Process (42 U.S.C. § 1983)

(By All Plaintiffs against Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES)

129.   Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 128 of this Complaint with the same force and effect as if fully set forth herein.

130.   Plaintiffs had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiffs' familial relationship with DECEDENT.

131.   DECEDENT had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state

actions that deprive him of life, liberty, or property in such a manner as to shock the conscience.

132.    The aforementioned actions of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES shock the conscience, in that they acted with deliberate indifference to the constitutional rights of DECEDENT and Plaintiffs, and with purpose to harm unrelated to any legitimate law enforcement objective.

133.    As a direct and proximate result of these actions, DECEDENT experienced pain and suffering, and eventual death.  Defendants thus violated the substantive due process rights of Plaintiffs to be free from unwarranted interference with their familial relationships with DECEDENT.

134.    As a direct and proximate cause of the acts of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES, Plaintiffs have suffered emotional distress and have been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of DECEDENT, and will continue to be so deprived for the remainder of their natural lives.

135.    The conduct of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT and Plaintiffs and therefore warrants the imposition of exemplary and punitive damages as to Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES.

136.    Plaintiffs bring this claim individually for wrongful death damages. Plaintiffs also seek attorney fees and costs under this claim.

**FOURTH CLAIM FOR RELIEF**

**Municipal Liability – Failure to Train (42 U.S.C. § 1983)**

(By All Plaintiffs against Defendants VILLANUEVA, COUNTY and DOES 7-10)

137. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 136 of this Complaint with the same force and effect as if fully set forth herein.

138. Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES acted under color of law.

139. The acts of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES deprived DECEDENT and Plaintiffs of their particular rights under the United States Constitution.

140. The training policies of Defendants VILLANUEVA, COUNTY and DOES 7-10, were not adequate to train its deputies to handle the usual and recurring situations with which they must deal, including but not limited to: the prolonged and continuous use of Tasers, summoning medical attention after Tasers are deployed on a subject, the risks associated with positional and restraint asphyxia, and the risks associated with restraining and placing body weight on a prone subject after they have been Tased for an extended period of time.

141. Defendants VILLANUEVA, COUNTY and DOES 7-10 were deliberately indifferent to the obvious consequences of its failure to train its deputies adequately. Defendants VILLANUEVA, COUNTY and DOES 7-10 knew or reasonably should have known that their failure to properly train DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES would cause DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES to violate Plaintiffs' and DECEDENT'S constitutional rights.

142. VILLANUEVA, COUNTY and DOES 7-10 failed to train Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES properly and adequately.

143. The failure of VILLANUEVA, COUNTY and DOES 7-10 to provide adequate training caused the deprivation of DECEDENT and Plaintiffs' rights by

Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES. The Defendants' failure to train is so closely related to the deprivation of the DECEDENT'S and Plaintiffs' rights as to be the moving force that caused the ultimate injury.

144.   The following are only a few examples of continued conduct by sheriff's deputies working for the County of Los Angeles, which indicate the County of Los Angeles's failure to properly train its sheriff's deputies:

  (a) On March 10, 2021, LASD deputy Douglass Johnson knelt on an inmate's neck for over three minutes while the inmate was handcuffed and restrained by multiple deputies. VILLANUEVA was aware that Deputy Johnson had knelt on the neck of the inmate for over three minutes because he had been shown a video of the incident. Nevertheless, VILLANUEVA attempted to cover up the incident, telling his subordinates that LASD did not need bad media. VILLANUEVA and LASD allowed Deputy Johnson to remain on the force as a deputy for over eight months before they relieved him of duty on November 18, 2021. Fifteen months prior, the same Deputy Johnson had taken photographs of Kobe Bryant and Gianna Bryant's deceased bodies and published them. Deputy Johnson was not retrained, disciplined, suspended, or terminated during the time period between the two incidents.

  (b) On March 16, 2020, Los Angeles Sheriff's Department deputies responded to a call from the mother of a man experiencing a mental health crisis. Upon arrival, Deputies proceeded to tase, beat, and restrain Eric Briceno in front of his mother and father.

1                    Coroner's officials concluded that Briceno died as a result of

2                    neck compressions and seven or eight Taser shocks.

3       (c)     On May 3, 2021, Los Angeles County agreed to pay $2 million

4                    to the family of Jeremy Spencer, a mentally ill man who died

5                    after Los Angeles County Sheriff's deputies tased and forcibly

6                    restrained him in 2018.

7       (d)     On January 6, 2015, Brian Pickett's mother called LASD

8                    deputies because her son was having a mental health episode.

9                    Upon their arrival, deputies tased Mr. Pickett for 34 seconds,

10                   causing him to fall into his bathtub. Deputies then dragged him

11                   into the hallway of his own home where he was pronounced

12                   dead. In reviewing the incident, LASD's official Corrective

13                   Action Plan indicated that a root cause of the incident was the

14                   LASD deputy's use of the Taser against the Decedent for 34

15                   seconds. The County of Los Angeles settled this case for $5

16                   million.

17       (e)     On August 3, 2012, LASD deputies beat Darren Burley

18                   placed their knees on his back, neck, and head, applying as

19                   much weight as possible. As Mr. Burley struggled to lift his

20                   chest in an effort to breathe, deputies tased Mr. Burley and

21                   applied more weight to his body. Mr. Burley lost consciousness

22                   and died 10 days later. A jury found the defendants liable and

23                   awarded $8 million in damages.

24       (f)     LASD employees were responsible for a larger number of

25                   deaths than other county departments in California in recent

26                   years.

27

28

145. The training policies of Defendant COUNTY were not adequate to train its deputies to handle the usual and recurring situations with which they must deal, including, but not limited to: responding to calls involving mentally ill people; responding to calls and interacting with people who display symptoms of mental illness; recognizing the indicators of mental illness; the use of force; the proper use of electronic control devices; the inappropriate and dangerous nature of prolonged Taser applications; the inappropriate and dangerous nature of prolonged prone restraint with body weight applied to the neck, torso, and back; and protecting the rights of persons to medical care while in police custody. Additionally, those training policies do not conform to nationally accepted standards in police practices or state law.

146. LASD's policies do not include any prohibition on placing weight on a restrained subject's neck, torso, or back.

147. LASD has also failed to promulgate and/or enforce policies to prevent the unnecessary and excessive use of Tasers. The following is a short, non-exhaustive list of critical directives that LASD's published policy omits: (1) a meaningful discussion regarding when it is appropriate to deploy a Taser, including the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before a Taser is deployed; (2) any mention of a limit on the amount of time a deputy may use a Taser on a person; (3) the inappropriateness of using a Taser on an individual who is clearly experiencing a mental health crisis; (4) the inappropriateness of using a Taser on an individual who is at "high-risk" for complications for any other reason, such as obesity; (5) the risks associated with multiple and continuous Taser deployments on a person.

148. The field training provided by COUNTY was inadequate to train its deputies to handle the usual and recurring situations with which they must deal, including responding to calls and interacting with people who display symptoms of mental illness, recognizing the indicators of mental illness, the use of force, the

proper use of electronic control devices, prone restraint, and protecting the rights of persons to medical care while in police custody.

149.    The sustainment and/or periodic training provided by COUNTY was inadequate to train its deputies to handle the usual and recurring situations with which they must deal, including responding to calls and interacting with people who display symptoms of mental illness, recognizing the indicators of mental illness, the use of force, the proper use of electronic control devices, prone restraint, and protecting the rights of persons to medical care while in police custody.

150.    By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, comfort, care, society, training, guidance, and past and future support of DECEDENT.  The aforementioned acts and omissions also caused DECEDENT'S pain and suffering, loss of life, loss of enjoyment of life, and death.

151.    Accordingly, Defendants VILLANUEVA, COUNTY and DOES 7-10 each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

152.    Plaintiffs bring this claim as successors-in-interest to DECEDENT, and seek survival damages, including but not limited to pre-death pain and suffering, loss of life, and loss of enjoyment of life, and wrongful death damages under this claim. Plaintiffs also seek attorneys' fees and costs under this claim.


## FIFTH CLAIM FOR RELIEF

**Municipal Liability – Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

(By All Plaintiffs against Defendants VILLANUEVA, COUNTY and DOES 7-10)

153.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 152 of this Complaint with the same force and effect as if fully set forth herein.

154.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES acted under color of law.

155.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES acted pursuant to an expressly adopted official policy, or a longstanding practice or custom of the Defendants VILLANUEVA, COUNTY and DOES 7-10.

156.   On information and belief, Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with DECEDENT'S death.

157.   Defendants VILLANUEVA, COUNTY and DOES 7-10, together with other COUNTY policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a)   Using excessive force, including deadly force on unarmed persons who do not pose a risk of imminent death or serious bodily injury to others;

(b)   Providing inadequate training regarding the use of force, including deadly force;

(c)   Maintaining a custom and practice of permitting prolonged and dangerous Taser applications;

(d)   Maintaining a custom and practice of permitting prolonged and dangerous prone restraint;

(e)   Employing and retaining as deputy Sheriffs, individuals such as Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES who Defendants VILLANUEVA, COUNTY and DOES 7-10 at all times material herein, knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force;

(f)    Inadequately supervising, training, controlling, assigning, and disciplining COUNTY deputies, and other personnel, including Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES, who Defendants VILLANUEVA, COUNTY, and/or DOES 7-10 knew, or in the exercise of reasonable care should, have known had the aforementioned propensities and character traits;

(g)    Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by COUNTY deputies, including Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES;

(h)    Failing to adequately discipline COUNTY deputy Sheriffs, including Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

(i)    Announcing that unjustified uses of force are "within policy," including in-custody deaths that were later determined in court to be unconstitutional;

(j)    Even where in-custody deaths are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the deputies involved;

(k)    Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simply "code of silence," pursuant to which Sheriff's deputies do

not report other deputies' errors, misconduct, or crimes.  Pursuant to this code of silence, if questioned about an incident of misconduct involving another deputy, while following the code, the deputy being questioned will claim ignorance of the other deputy wrongdoing.

(l)   Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of in-custody deaths, including by failing to discipline, retrain, investigate, terminate, and recommend deputies for criminal prosecution who participate in the in-custody-death of unarmed, nonviolent, compliant, and/or potentially mentally impaired people.

158.   By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, comfort, care, society, training, guidance, and past and future support of DECEDENT.  The aforementioned acts and omissions also caused DECEDENT'S pain and suffering, loss of enjoyment of life, and death.

159.   Defendants VILLANUEVA, COUNTY and DOES 7-10, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above, these Defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of DECEDENT, Plaintiffs, and other individuals similarly situated.

160.   By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, VILLANUEVA, COUNTY and DOES 7-10 acted with intentional, reckless, and callous disregard for the life of DECEDENT and for DECEDENT'S and Plaintiffs' Constitutional rights.  Furthermore, the policies,

practices, and customs implemented, maintained, and still tolerated by Defendants VILLANUEVA, COUNTY and DOES 7-10 were affirmatively linked to and were a significantly influential force behind the injuries of DECEDENT and Plaintiffs.

161. Accordingly, Defendants VILLANUEVA, COUNTY and DOES 7-10 each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

162. Plaintiffs bring this claim individually and as successors-in-interest to DECEDENT, and seek survival damages, including pre-death pain and suffering, loss of life, and loss of enjoyment of life, and wrongful death damages under this claim. Plaintiffs also seek attorneys' fees and costs under this claim.

## SIXTH CLAIM FOR RELIEF

### Municipal Liability – Ratification (42 U.S.C. § 1983)

(By All Plaintiffs against Defendants VILLANUEVA, COUNTY and DOES 7-10)

163. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 162 of this Complaint with the same force and effect as if fully set forth herein.

164. Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES acted under color of law.

165. The acts of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES deprived DECEDENT and Plaintiffs of their particular rights under the United States Constitution.

166. Upon information and belief, a final policymaker, acting under color of law, who had final policymaking authority concerning the acts of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES ratified the individual deputy defendants' acts and the bases for them. Upon information and belief, the final policymaker knew of and specifically approved of the individual deputy defendants' acts.

167.   Upon information and belief, a final policymaker has determined (or will determine) that the acts of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES were "within policy."

168.   The following are only a few examples of cases where the involved deputies were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with the underlying acts giving rise to the below lawsuits, which indicates that the County of Los Angeles routinely ratifies such behavior:

(a)   On March 10, 2021, LASD deputy Douglass Johnson knelt on an inmate's neck for over three minutes while the inmate was handcuffed and restrained by multiple deputies. VILLANUEVA was aware that Deputy Johnson had knelt on the neck of the inmate for over three minutes because he had been shown a video of the incident. Nevertheless, VILLANUEVA attempted to cover up the incident, telling his subordinates that LASD did not need bad media. VILLANUEVA and LASD allowed Deputy Johnson to remain on the force as a deputy for over eight months before they relieved him of duty on November 18, 2021. Fifteen months prior, the same Deputy Johnson had taken photographs of Kobe Bryant and Gianna Bryant's deceased bodies and published them. Deputy Johnson was not retrained, disciplined, suspended, or terminated during the time period between the two incidents.

(b)   On March 16, 2020, Los Angeles Sheriff's Department deputies responded to a call from the mother of a man experiencing a mental health crisis. Upon arrival, Deputies proceeded to tase, beat, and restrain Eric Briceno in front of his mother and father. Coroner's officials concluded that Briceno died as a result of

1    neck compressions and seven or eight Taser shocks. On

2    information and belief, the involved deputies were not

3    disciplined, retrained, suspended, or terminated for said acts.

4    (c)    On May 3, 2021, Los Angeles County agreed to pay $2 million

5    to the family of Jeremy Spencer, a mentally ill man who died

6    after Los Angeles County Sheriff's deputies tased and forcibly

7    restrained him in 2018. On information and belief, the involved

8    deputies were not disciplined, retrained, suspended, or

9    terminated for said acts.

10    (d)    On January 6, 2015, Brian Pickett's mother called LASD

11    deputies because her son was having a mental health episode.

12    Upon their arrival, deputies tased Mr. Pickett for 34 seconds,

13    causing him to fall into his bathtub. Deputies then dragged him

14    into the hallway of his own home where he was pronounced

15    dead. In reviewing the incident, LASD's official Corrective

16    Action Plan indicated that a root cause of the incident was the

17    LASD deputy's use of the Taser against the Decedent for 34

18    seconds. The County of Los Angeles settled this case for $5

19    million. On information and belief, the involved deputies were

20    not disciplined, retrained, suspended, or terminated for said acts.

21    (e)    On August 3, 2012, LASD deputies beat Darren Burley and

22    placed their knees on his back, neck, and head, applying as

23    much weight as possible. As Mr. Burley struggled to lift his

24    chest in an effort to breathe, deputies tased Mr. Burley and

25    applied more weight to his body. Mr. Burley lost consciousness

26    and died 10 days later. A jury found the defendants liable and

27    awarded $8 million in damages. On information and belief, the

28

1    involved deputies were not disciplined, retrained, suspended, or

2    terminated for said acts.

3        (f)    LASD employees were responsible for a larger number of

4        deaths than other county departments in California in recent

5        years.

6    169.   By reason of the aforementioned acts and omissions, Plaintiffs have

7    suffered loss of the love, companionship, comfort, care, society, training, guidance,

8    and past and future support of DECEDENT.  The aforementioned acts and omissions

9    also caused DECEDENT'S pain and suffering, loss of life, loss of enjoyment of life,

10   and death.

11   170.   Accordingly, Defendants VILLANUEVA, COUNTY and DOES 7-10

12   each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

13   171.   Plaintiffs bring this claim individually and as successors-in-interest to

14   DECEDENT, and seek survival damages, including pre-death pain and suffering, loss

15   of life, and loss of enjoyment of life, and wrongful death damages under this claim.

16

17   ## SEVENTH CLAIM FOR RELIEF

18   **Battery**

19   **(Wrongful Death/Survival Action)**

20   (By All Plaintiffs against COUNTY, DE LA TORRE, VALDIVIA, HOUTH, and
     DOE DEPUTIES 5-10)

21

22   172.   Plaintiffs repeat and re-allege each and every allegation in paragraphs 1

23   through 171 of this Complaint with the same force and effect as if fully set forth

24   herein.

25   173.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE

26   DEPUTIES, while working as deputies and/or agents of the County of Los Angeles

27   Sheriff's Department, and acting within the course and scope of their duties,

28

1   intentionally grabbed, tased, and restrained DECEDENT chest down, and used

2   unreasonable force against him.

3        174.   For approximately five minutes, DE LA TORRE, VALDIVIA, and

4   HOUTH failed to monitor DECEDENT's vital signs and breathing and continued

5   applying their body weight to DECEDENT's back, neck, and head. DE LA TORRE,

6   VALDIVIA, and HOUTH continued the restraint even after DECEDENT stopped

7   resisting and eventually lost consciousness.

8        175.   After being tased for 35 seconds while in the midst of a mental health

9   crisis and continuously restrained with pressure to his back and neck for

10  approximately five minutes, DECEDENT eventually became unresponsive and died

11  on scene.

12       176.   DECEDENT suffered severe pain and suffering, loss of life, and loss of

13  enjoyment of life.  Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE

14  DEPUTIES had no legal justification for using force against DECEDENT, and their

15  use of force while carrying out their duties as deputies and agents of the COUNTY

16  were unreasonable and nonprivileged uses of force.

17       177.   As a direct and proximate result of the conduct of Defendants DE LA

18  TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES as alleged above,

19  DECEDENT sustained injuries and died, and also lost his earning capacity.

20       178.   COUNTY and DOES 7-10 are vicariously liable for the wrongful acts of

21  Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES pursuant

22  to section 815.2(a) of the California Government Code, which provides that a public

23  entity is liable for the injuries caused by its employees within the scope of the

24  employment if the employee's act would subject him or her to liability, under

25  California law, and under the doctrine of *respondeat superior*.

26       179.   The conduct of Defendants DE LA TORRE, VALDIVIA, HOUTH, and

27  DOE DEPUTIES was malicious, wanton, oppressive, and accomplished with a

28

conscious disregard for the rights of Plaintiffs and DECEDENT, entitling Plaintiffs, individually and as successors-in-interest to DECEDENT, to an award of exemplary and punitive damages.

180. Plaintiffs bring this claim individually and as successors-in-interest to the DECEDENT, and seek wrongful death and survival damages under this claim.

## EIGHTH CLAIM FOR RELIEF

### Negligence and Negligent Infliction of Emotional Distress

### (Wrongful Death/Survival Action)

(By All Plaintiffs against All Defendants)

181. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 180 of this Complaint with the same force and effect as if fully set forth herein.

182. Sheriff's deputies, including Defendants have a duty to use reasonable care to prevent harm or injury to others. This duty includes using appropriate tactics, giving appropriate commands, giving appropriate warnings, and not using any force unless necessary, using the least amount of force necessary, and only using deadly force as a last resort. These duties also include providing proper training and equipment to deputies so that they may perform their duties in accordance with the department policies, properly investigate use of force incidents, and punish, re-train, terminate, and/or prosecute violators of those policies and the law.

183. Defendants breached this duty of care. Upon information and belief, the actions and inactions of Defendants were negligent and reckless, including but not limited to:

    (a)    The failure to properly and adequately assess the need to detain, arrest, and use force or deadly force against DECEDENT;

(b)    The failure to recognize the indicators of mental illness or impairment, and/or the failure to use proper tactics and techniques on person suffering from a mental illness;

(c)    The negligent and prolonged use of Tasers;

(d)    The negligent use of prolonged prone restraint;

(e)    The negligent tactics and handling of the situation with DECEDENT, including pre-force negligence;

(f)    The failure to provide prompt medical care to DECEDENT;

(g)    The failure to properly train deputies to properly handle encounters with people suffering from a mental illness, to properly assess the need to use force, and the type of force appropriate;

(h)    The failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of DECEDENT;

(i)    The negligent handling of evidence and witnesses;

(j)    The negligent communication of information during the incident;

(k)    The negligent investigation of the incident; and

(l)    The failure to punish, re-train, terminate, and/or prosecute violators of Department policies and the law.

184.   For approximately five minutes, DE LA TORRE, VALDIVIA, and HOUTH failed to monitor DECEDENT's vital signs and breathing and continued applying their body weight to DECEDENT's back, neck, and head. DE LA TORRE, VALDIVIA, and HOUTH continued the restraint even after DECEDENT stopped resisting and eventually lost consciousness.

185.   After being tased for 35 seconds while in the midst of a mental health crisis and continuously restrained with pressure to his back and neck for

approximately five minutes, DECEDENT eventually became unresponsive and died on scene.

186.   As a direct and proximate result of Defendants' conduct as alleged above, DECEDENT was caused to suffer severe pain and suffering, and eventual death.  Also, as a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs have suffered emotional distress and mental anguish.  Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of DECEDENT, and will continue to be so deprived for the remainder of their natural lives.

187.   While working for COUNTY and acting within the course and scope of their duties as sheriff's deputies, DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES negligently and carelessly inflicted severe emotional distress on Plaintiffs when they forcibly took DECEDENT to the ground, tased, piled on DECEDENT'S back, and restrained DECEDENT, all in the presence of Plaintiffs S.H., A.H., and TIFFANY HAYES.

188.   Plaintiffs were present at or near the scene of the incident when the use of force against their family member, DECEDENT, occurred, observed the incident, and were aware that Defendants' actions were causing injury to DECEDENT.

189.   Defendants' conduct was a substantial factor in causing Plaintiffs to suffer severe emotional distress, including but not limited to, paralyzing fear, anxiety, anguish, humiliation, and other injuries to their nervous systems.

190.   VILLANUEVA, COUNTY and DOES 7-10 are vicariously liable for the wrongful acts of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability, under California law, and under the doctrine of *respondeat superior*.

191.   Plaintiffs bring this claim individually and as successors-in-interest to DECEDENT and seek wrongful death and survival damages under this claim. Plaintiffs also seek compensatory damages for their severe emotional distress resulting from observing the negligent use of force against their family member, DECEDENT.

**NINTH CLAIM FOR RELIEF**

**(Violation of Cal. Civil Code § 52.1)**

(By All Plaintiffs against All Defendants)

192.   Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 191 of this Complaint with the same force and effect as if fully set forth herein.

193.   California Civil Code, Section 52.1 (the Bane Act), whether or not acting under color of law, prohibits interference by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of the state of California.

194.   On information and belief, Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES, while working for the COUNTY and acting within the course and scope of their duties, intentionally committed acts of violence, threats, intimidation, and coercion against DECEDENT, including taking DECEDENT to the ground, tasing, and restraining DECEDENT chest down without justification or excuse, by integrally participating and/or failing to intervene in the above act, and by denying DECEDENT necessary medical care, which interfered with DECEDENT' and Plaintiffs' exercise and/or enjoyment of their rights secured by the Constitution and/or laws of the United States, and of the rights secured by the Constitution and/or laws of the state of California.

195.   When Defendants used excessive and unreasonable force against DECEDENT, they interfered with his civil rights to be free from excessive force to due process, to equal protection of the laws, to medical care, to be free from state actions that shock the conscience, to be free from wrongful governmental interference with familial relationships, and to life, liberty, and property. Defendants did so with an intent to deprive DECEDENT of those rights, demonstrated by a reckless disregard for those rights.

196.   On information and belief, Defendants intentionally and spitefully committed the above acts to discourage DECEDENT from exercising his civil rights or to prevent him from exercising such rights, which he was fully entitled to enjoy.

197.   On information and belief, DECEDENT reasonably believed and understood that the violent acts committed by Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES were intended to discourage him from exercising the above civil rights or to prevent him from exercising such rights.

198.   Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES successfully interfered with the above civil rights of DECEDENT.

199.   The conduct of Defendants was a substantial factor in causing DECEDENT's harms, losses, injuries, and damages.

200.   To the extent this claim is based upon a violation of the Decedent's rights, it is asserted as a survival action. To the extent that the violations of the rights were perpetrated on and suffered by the Plaintiffs, it is asserted as a personal claim; and, to the extent the violations were perpetrated on both Plaintiffs and Decedent, it is asserted as a survival and personal claim.

201.   COUNTY is vicariously liable for the wrongful acts of Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is

liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

202. Defendants DOES 7-10 are vicariously liable under California law and the doctrine of *respondeat superior*.

203. The conduct of Defendants was malicious, wanton, oppressive, and accomplished with a conscious disregard for DECEDENT' rights, justifying an award of exemplary and punitive damages as to Defendants DE LA TORRE, VALDIVIA, HOUTH, and DOE DEPUTIES.

204. Plaintiffs bring this claim as successors-in-interest to DECEDENT and seek survival damages, including emotional distress, loss of life, and loss of enjoyment of life, under this claim. Plaintiffs also seek treble damages, attorneys' fees, and costs under this claim.

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs A.H., S.H., and TIFFANY HAYES request entry of judgment in their favor and against COUNTY; ALEX VILLANUEVA, Sheriff; CARLOS DE LA TORRE; ALEX VALDIVIA; JANET HOUTH; and DOES 5-10, inclusive, as follows:

    A.    For compensatory damages in whatever other amount may be proven at trial, including survival damages, which include pre-death physical and mental pain and suffering, loss of life, and loss of enjoyment of life, as well as wrongful death damages under federal and state law;

    B.    For funeral and burial expenses, and loss of financial support;

    C.    For punitive damages against the individual defendants in an amount to be proven at trial;

    D.    For statutory damages;

    E.    For interest;

    F.    For reasonable attorneys' fees, including litigation expenses;

    G.    For costs of suit; and

    H.    For such further other relief as the Court may deem just, proper, and appropriate.

DATED:  October 31, 2022      LAW OFFICES OF DALE K. GALIPO

By:        */s/ Dale K. Galipo*
        Dale K. Galipo
        Eugenia Bagdassarian
        *Attorneys for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury.

DATED:  October 31, 2022   LAW OFFICES OF DALE K. GALIPO


        By:_____*/s/ Dale K. Galipo*_____
           Dale K. Galipo
           Eugenia Bagdassarian
           *Attorneys for Plaintiffs*